**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 30, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP77-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2015CF429

**IN COURT OF APPEALS**
**DISTRICT II**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

SEAN R. WOLFE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Washington County: JAMES G. POUROS, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Sean R. Wolfe appeals a judgment of conviction for two counts of possession of child pornography as a repeater.  He also appeals an order denying his postconviction motion, in which he alleged that his initial attorney was constitutionally ineffective for failing to seek suppression of his custodial statements.  On appeal, he renews his ineffective assistance of counsel argument, asserting that his custodial statements were made involuntarily and without a valid *Miranda*[1] waiver.  We conclude Wolfe validly waived his *Miranda* rights and his statements were voluntarily made.  Accordingly, his attorney was not ineffective for failing to seek suppression of the statements.  We affirm.

## BACKGROUND

¶2     Wolfe was charged with seven counts of possession of child pornography as a repeater after his probation agent learned that his mother retrieved a cell phone (which he was not supposed to have) from Wolfe's residence in a Department of Corrections housing facility.  At the time, Wolfe had been placed by his agent at the Washington County Jail due to his threatening self-harm.  Wolfe's mother delivered the phone to the agent, who discovered images of suspected child pornography.  The agent referred the matter to Detective Eric Grinwald of the West Bend Police Department, who obtained a search warrant and conducted a custodial interview with Wolfe.  During the interview, Wolfe admitted to possessing the cell phone and downloading child pornography on it, but denied he had viewed the pornography for sexual gratification.

---

[1]  *See **Miranda v. Arizona**, 384 U.S. 436 (1966).

¶3      Wolfe's counsel raised concerns about Wolfe's competency, but Wolfe withdrew his competency challenge following an evaluation, and the circuit court found him competent to proceed. Pursuant to a plea agreement, Wolfe pleaded guilty to two counts as charged, and the remaining five counts were dismissed and read in.

¶4      Following receipt of the presentence investigation report (PSI), the circuit court expressed concern with Wolfe's protestations of innocence to the PSI writer. Wolfe orally expressed a desire to withdraw his pleas, at which time the court requested written argument.[2] The court ultimately denied the motion for plea withdrawal and set the matter for sentencing, at which time it ordered a lengthy prison sentence on one count and probation with an imposed and stayed sentence on the other count.

¶5      Wolfe filed a motion for postconviction relief seeking plea withdrawal and the suppression of his statements to law enforcement.[3] Wolfe argued that given his personal characteristics, the State had failed to obtain a knowing and intelligent waiver of Wolfe's constitutional rights following *Miranda* warnings. Additionally, he argued that the tactics used by Grinwald rendered his statements involuntary. Wolfe framed each of these issues as a

---

[2] Attorney Brian Borkowicz was initially appointed to represent Wolfe. During briefing on the withdrawal motion, Borkowicz withdrew from the representation, and successor counsel was appointed. The ineffective assistance of counsel claims raised in this appeal apparently pertain only to the adequacy of Borkowicz's representation, as he was the only one of Wolfe's attorneys to testify at the postconviction hearing.

[3] Alternatively, Wolfe sought resentencing before a different judge, alleging the circuit court had ordered an illegal sentence, considered inaccurate information, and demonstrated bias toward Wolfe. Wolfe does not raise these issues on appeal, and we will not consider them further except insofar as it is necessary to discuss the procedural history of this case.

challenge to the constitutional effectiveness of his initial attorney, who had failed to request a *Miranda-Goodchild* hearing.[4]

¶6    The circuit court conducted a *Machner* hearing.[5]  Wolfe presented testimony from Dr. Nick Yackovich, a psychologist; Grinwald; Randy Berry and Benjamin Bauer, correctional officers at the Washington County Jail; and Wolfe's initial attorney.  After considering their testimony and listening to a recording of the interview, the court denied Wolfe's postconviction motion, determining that he validly waived his constitutional rights following *Miranda* warnings and his statements to Grinwald were voluntary.  Consequently, the court determined counsel was not deficient for failing to bring a motion to suppress, as such a motion would have been meritless.

¶7    Wolfe sought resentencing on the basis of an illegal probationary sentence, which was granted.[6]  At the same time, he sought to appeal the denial of his *Miranda-Goodchild* motion.  We concluded such bifurcation was improper and required Wolfe to wait until he was resentenced to appeal.  After resentencing, Wolfe renewed his *Miranda-Goodchild* claims, asserting that "new developments in relevant case law" warranted "further postconviction proceedings on his plea withdrawal claim."  Wolfe requested that he be allowed to supplement the

_____

[4] Named after *Miranda* and *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), such hearings are designed to determine the adequacy of *Miranda* warnings, whether the defendant validly waived his or her constitutional rights, and whether the ensuing statements were voluntarily made.  *See State v. Jiles*, 2003 WI 66, ¶25, 262 Wis. 2d 457, 663 N.W.2d 798.

[5] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[6] The Honorable Todd K. Martens presided over Wolfe's original sentencing and postconviction proceedings.  The Honorable James G. Pouros presided over Wolfe's resentencing and subsequent proceedings.

postconviction evidence with his own testimony in support of his motion.[7] The court received Wolfe's testimony, but it found him incredible and denied the renewed motion. Wolfe now appeals.

## DISCUSSION

¶8 Wolfe asserts his initial attorney was constitutionally ineffective for failing to seek suppression of his custodial statements on the dual bases that the waiver of his constitutional rights following *Miranda* warnings was not knowing, intelligent and voluntary, and that his statements themselves were coerced. Because we conclude any challenge on these bases would not have been successful, we hold that Wolfe received constitutionally adequate assistance. *See State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16 (holding counsel does not perform deficiently by failing to bring a meritless motion).

¶9 We apply the same two-tier standard of review to issues regarding the validity of a *Miranda* waiver and the voluntariness of a defendant's statements. *See State v. Markwardt*, 2007 WI App 242, ¶30, 306 Wis. 2d 420, 742 N.W.2d 546; *State v. Rockette*, 2005 WI App 205, ¶22, 287 Wis. 2d 257, 704 N.W.2d 382. We will not overturn the circuit court's findings of historical fact

---

[7] As the circuit court noted, Wolfe's postconviction counsel was clear that she was not seeking to revisit the circuit court's earlier factual findings.

unless they are clearly erroneous.[8] ***Id.*** However, the application of constitutional principles to those facts presents a question of law that we review de novo. ***Id.***

¶10 We first consider whether Wolfe validly waived his constitutional rights following ***Miranda*** warnings. At a suppression hearing, the State would have been required to show that Wolfe received and understood a set of ***Miranda*** warnings sufficient to advise him of his constitutional rights and that he knowingly and intelligent waived those rights following administration of the warnings. ***State v. Jiles***, 2003 WI 66, ¶26, 262 Wis. 2d 457, 663 N.W.2d 798. Wolfe does not challenge the adequacy of the ***Miranda*** warnings given, only whether he validly waived his rights.

¶11 A waiver is "knowing, voluntary and intelligent where it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and has 'been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" ***State v. Ward***, 2009 WI 60, ¶30, 318 Wis. 2d 301, 767 N.W.2d 236 (citation omitted). Only if the totality of the circumstances demonstrates that a defendant with the requisite level of comprehension made an uncoerced choice will we conclude that a waiver was valid. ***State v. Rejholec***, 2021 WI App 45, ¶29, 398 Wis. 2d 729, 963 N.W.2d 121.

---

[8] Relying on ***State v. Jimmie R.R.***, 2000 WI App 5, ¶39, 232 Wis. 2d 138, 606 N.W.2d 196 (Ct. App. 1999), Wolfe asks that we disregard this well-settled proposition and conduct a wholly de novo review. In ***Jimmie R.R.***, however, the "only evidence" on the legal question presented was a videotape recording. ***Id.*** Here, by contrast, the circuit court took extensive testimony during the ***Machner*** hearing—at Wolfe's request—about the circumstances of the questioning, in addition to listening to the audio recording of Wolfe's interview. Accordingly, we review the court's factual findings under the clearly erroneous standard.

¶12 The State establishes a prima facie case for a valid waiver when it demonstrates that the defendant was read the *Miranda* warnings and indicated he or she understood them and was willing to make a statement. *See Ward*, 318 Wis. 2d 301, ¶30; *State v. Lee*, 175 Wis. 2d 348, 360, 499 N.W.2d 250 (Ct. App. 1993). Here, the circuit court found that early on in the interview, Grinwald read Wolfe each of the rights required by the *Miranda* warnings, and each time Wolfe responded that he understood that right. He then agreed to provide a statement to Grinwald and signed the waiver form.

¶13 Given the State's prima facie case, Wolfe must demonstrate "countervailing evidence" that his waiver was invalid. *See Lee*, 175 Wis. 2d at 361. Wolfe points to several factors—including lengthy pre-interrogation detention, an ongoing mental health crisis punctuated by erratic behavior and suicidal ideations, and certain cognitive limitations—that rendered his waiver invalid. We conclude none of these factors are sufficient to produce an invalid waiver.

¶14 Wolfe was twenty-four-years old and a high school graduate. Although it is undisputed that Wolfe has some cognitive limitations, Yackovich opined that his IQ and functional intelligence level "would be considered average or low average." Yackovich was also of the opinion that Wolfe would exaggerate some of his mental health symptoms. Yackovich's testimony does not establish

that Wolfe was incapable of understanding or waiving his rights, despite his cognitive limitations and erratic—including arguably suicidal—behavior.[9]

¶15 As further explained below, Wolfe's lengthy pre-interrogation detention—approximately five weeks on a probation hold—also is a relatively insignificant factor given the totality of the circumstances. Wolfe had been read the *Miranda* warnings before. The audio recording of the exchange does not in any way suggest Wolfe was confused about his rights. Grinwald asked Wolfe to tell him if Wolfe was confused about anything, and Wolfe never requested clarification. Nor does the appellate record support a finding that threats, pressure or coercion were used to obtain Grinwald's waiver.

¶16 Wolfe counters that his waiver was involuntary because Grinwald "implied that he could not help Mr. Wolfe with his safety concerns until and unless he first waived" his rights. To be sure, Grinwald's administration of the *Miranda* warnings and his request for a waiver of rights occurred after a few minutes of preliminary discussion about Wolfe's jail situation and his threats of suicide. In our view, however, the content and context of the discussion does not lend itself to Wolfe's interpretation.

---

[9] Some of the pre-interview behavior testified to at the *Machner* hearing included Wolfe scratching his neck with a comb, hitting his head against a wall and the floor, and submerging his head in a toilet. After the interview, Wolfe placed a table leg on his neck, but the correctional officer was unsure if he was supporting the table with his hands. We note at certain points during the interrogation, Wolfe appeared to somewhat downplay the seriousness of his suicidal threats. At the conclusion of the interview, when Grinwald asked if Wolfe felt like he was going to kill himself, Wolfe responded that he did not but wanted to go to a mental health institution. Nonetheless, Grinwald appears to have taken Wolfe's threats seriously by reporting the threats to jail staff after the interview.

¶17   Specifically, Grinwald immediately introduced himself to Wolfe as a police detective. Grinwald asked how Wolfe was being treated, and Wolfe replied he was being treated "like shit," adding, "I was about to kill myself in here."[10] Wolfe said he "[couldn't] stand being in this jail," then complained about his probation agent and claimed he had been recently bullied and in a fight. The following exchange then occurred:

> Grinwald: I want to talk to you about this stuff, I really do, and it seems like you would be willing to talk about some of it too, but before I do that, because we're here, I'm not, like, a probation agent or anything like that, I have to read you a form before I can talk to you when you're in jail. The form is your rights, have you ever had your rights read to you?
>
> Wolfe: The rights?
>
> Grinwald: Yeah, your rights. Like … and I can read this to you. Well, first of all, can we talk? I'd like to talk to you a little bit about this, and how it's going in here, and how you ended up here, and stuff like that, is that cool?
>
> Wolfe: Well, I still want to start with that part where I got in here.
>
> Grinwald: Absolutely, yeah, that's fine with me. But I want to hear about it, and I like to ask questions while I'm talking to people, and I can't ask you any questions unless I read you this first. You know what I'm saying?
>
> Wolfe: Okay.
>
> Grinwald: Okay. So I'm going to read this to you, I'm going to see if you understand everything. If you don't understand something, tell me and I will try to explain it the best—
>
> Wolfe: So, I'm shaking, I'm cold.

---

[10] The audio recording does not appear to have been transcribed. The transcription in this opinion is based on this court's review of the audio file.

> Grinwald: It is chilly, yeah. I'm cold too and I got a jacket on. Alright, before I read you—before I ask you any questions, you must know that you have the following rights under the United States and Wisconsin constitutions.

Grinwald then read Wolfe each of his *Miranda* rights. Wolfe acknowledged each time that he understood that right, and he said he was willing to make a statement. We concur with the circuit court's assessment that there was no threat to withhold aid unless Wolfe waived his rights, nor was there a promise that Grinwald would provide aid in exchange for the waiver.

¶18 Wolfe also argues his statements were involuntary. At a suppression hearing, the State would have had to demonstrate the voluntariness of Wolfe's statements by a preponderance of the evidence. *See State v. Dobbs*, 2020 WI 64, ¶72, 392 Wis. 2d 505, 945 N.W.2d 609. Voluntariness is evaluated in light of all the circumstances surrounding the interrogation by balancing the defendant's personal characteristics against the actions of law enforcement. *Id.*

¶19 Largely for the reasons set forth above, Wolfe contends he was "particularly susceptible to police pressure." While Wolfe acknowledges his prior interactions with police are a factor tending to show voluntariness, he contends his cognitive limitations, suicidal ideations, and emotional state weigh "heavily against voluntariness." Wolfe further argues that the police pressures applied to him—including "[e]xcessive incarceration" and Grinwald's "manipulation, deceit, and ridicule" —also militate against voluntariness.

¶20 We agree with the State that, considering the totality of the circumstances, Wolfe's statements were the product of his free and unconstrained will. His cognitive limitations and mental health issues were not so severe that he was incapable of resisting the police pressures applied in this case, which we

discuss more fully below. Wolfe was undisputedly subject to a lengthy pre-interrogation detention, but the detention was a result of his prior conduct that had been subject to adversarial testing in the judicial system and resulted in a period of supervision. Contrary to Wolfe's claim, it was not the equivalent of pre-arraignment delay.

¶21 The conditions under which the questioning occurred were not extreme in any fashion. Wolfe was questioned in a room in the jail behind a closed door. He was not questioned for a lengthy period of time—approximately one hour and twelve minutes. He was not in handcuffs, and was questioned by only a single investigator, who did not have a gun. Grinwald did not raise his voice to Wolfe.[11] Our review of the audio recording confirms the circuit court's finding that the tone of the interview was generally "conversational." Wolfe himself terminated the interview by requesting counsel.

¶22 Coercive police tactics are a necessary predicate to a finding of involuntariness. *State v. Deets*, 187 Wis. 2d 630, 635, 523 N.W.2d 180 (Ct. App. 1994). Many of the purportedly coercive tactics cited by Wolfe occurred late in the interview, after Wolfe admitted he had a cell phone and had downloaded child pornography on it. Wolfe had offered various explanations for his doing so, including that he was angry, that he believed he could reopen a prior child pornography case by catching new charges, because he figured that if people

---

[11] Wolfe disputes that Grinwald did not raise his voice. Our review of the audio recording confirms the circuit court's factual finding. Even if Grinwald arguably took a more stern tone with Wolfe at certain points in the interview, there was no yelling or exclamations involved.

thought he was looking at child pornography he might as well prove them right, and that he was playing his probation officer's game.

¶23    While trying to elicit Wolfe's confession to viewing the child pornography for sexual gratification, Grinwald took a reassuring tone with Wolfe, asking him to be honest, telling him it was okay if child pornography turned him on, it was "no big deal" and there was "nothing wrong" with downloading pornography, although he said it was a "little bit different" given that the images were of children.  Wolfe repeatedly insisted that he did not receive sexual gratification from looking at child pornography and did not like to view it.  At times, Grinwald took a more stern tone, accusing Wolfe of lying and dismissing his various and inconsistent explanations for looking at the child pornography.

¶24    We disagree with Wolfe's assertion that these tactics overcame his free will.  The most compelling evidence of this is that Grinwald never was successful at getting Wolfe to admit that he was sexually aroused by the child pornography.  *Cf. **Minnesota v. Murphy***, 465 U.S. 420, 438 (1984) (noting that defendant's adamant denial of committing one crime demonstrated his will had not been overcome during his confession to other crimes).  To the extent Wolfe suggests Grinwald employed a deceitful "false friend" technique, the Supreme Court has considered this a coercive factor when there was a preexisting "bond of friendship" between the officer and the defendant, which led the defendant to believe he could place trust in the officer.  *See **Spano v. New York***, 360 U.S. 315, 323-24 (1959).  No such situation is present here.

¶25    Moreover, general exhortations to honesty or to do the right thing are not categorically impermissible.  ***Simmons v. Bowersox***, 235 F.3d 1124, 1133 (8th Cir. 2001); ***Stawicki v. Israel***, 778 F.2d 380, 383 (7th Cir. 1985).  A police

officer may express dissatisfaction with a defendant's responses of which he or she is skeptical and may also suggest that cooperation would be to the defendant's benefit, as long as leniency is not promised. *Deets*, 187 Wis. 2d at 636. The circuit court concluded that some of Grinwald's statements were directed at reassuring Wolfe that his downloading of child pornography was a less serious matter than if he had taken photographs of nude children himself.[12]

¶26     Wolfe claims he was confused regarding who Grinwald was, noting that during the interview he asked Grinwald if he was an attorney. Grinwald identified himself at the beginning of the interview, and it was only when Grinwald began asking detailed questions about how many images Wolfe downloaded and when he downloaded them that Wolfe questioned Grinwald about his occupation. Grinwald responded that he thought Wolfe knew he was a police detective, because Wolfe had previously asked him about additional charges. Wolfe did not further comment on this purported confusion during the interview, and he was not even asked at the *Machner* hearing whether he was truly confused.

¶27     In short, the totality of the circumstances demonstrates that any arguably coercive tactics used during the interrogation did not overcome Wolfe's free will so as to render his statements involuntary. Moreover, as explained above, the appellate record demonstrates Wolfe's waiver of his constitutional rights following administration of *Miranda* warnings was knowing, intelligent and

---

[12] Although Wolfe contends Grinwald's concerns about Wolfe generating child pornography himself were farcical, we note that during the interview Grinwald questioned Wolfe about some images that were apparently created by him using his cell phone's camera. Grinwald told Wolfe he did not believe Wolfe took any of the pictures of suspected child pornography, but he wanted Wolfe to confirm that belief. On this record, we cannot gainsay, as Wolfe does, the possibility that he had an opportunity to create one or more of the images he apparently had in his possession.

voluntary. As a result, his initial attorney was not constitutionally ineffective for failing to seek suppression of his incriminating statements.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.